IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 17-031-01 |
| HAROLD COX | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                                                                       **JUNE  2 , 2017**

      Presently before the Court is Defendant Harold Cox's Motion to Suppress Physical Evidence and Statements. (ECF No. 20.) For the following reasons, Defendant's Motion will be granted.

**I.    BACKGROUND**

      Defendant Harold Cox has been charged with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Indictment, ECF No. 1.) The firearm that serves as the basis for this charge was located by two Pennsylvania State Troopers in the trunk of Defendant's car during a traffic stop. Defendant seeks to suppress the firearm and statements that he made to the State Troopers after the firearm was seized. Defendant contends that the Troopers lacked a reasonable suspicion to stop him for a traffic violation, and also lacked a reasonable suspicion to detain Defendant beyond the time necessary to investigate the alleged traffic infractions.[1] After a review of all of the evidence and testimony, we conclude that although the State Troopers' decision to initiate a traffic stop of Defendant's vehicle may have

---

[1] Defendant also argues that the canine search of the vehicle did not provide probable cause to search the trunk because the police dog demonstrated unreliability and was "cued" by its canine handler. Finally, Defendant contends that statements he made during the traffic stop, including his confession as to ownership of the firearm, were taken in violation of his Fifth Amendment rights.

been lawful, the State Troopers' detention of Defendant for an extended period of time beyond the investigation of the alleged traffic violations violated Defendant's Fourth Amendment rights. As a result, any evidence obtained during the traffic stop, including items obtained during the search of the vehicle, as well as statements obtained from Defendant, will be suppressed.

### A. Procedural History

On January 17, 2017, a grand jury returned an Indictment, charging Defendant with possession of a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).

On April 18, 2017, Defendant filed this Motion to Suppress Physical Evidence and Statements. (Def.'s Mot., ECF No. 20.) Attached as Exhibit A to the Motion to Suppress is a DVD containing a video recording of the July 23, 2016 traffic stop, vehicle search, and arrest. (Video, Def's Mot. Ex. A.) On May 4, 2017, the Government filed a Response in Opposition to Defendant's Motion to Suppress. (Gov't's Resp., ECF No. 24.) On May 8, 2017, Defendant filed a Reply. (Def.'s Reply, ECF No. 27.)

A suppression hearing was held on May 9, 2017. (*See* May 9, 2017 Hr'g Tr. (on file with Court).) During the hearing, the Government presented the testimony of Pennsylvania State Troopers Jeffrey Smith and Mark Salerno, who initiated the traffic stop, and subsequently detained and arrested of Defendant. The Government also presented the testimony of Philadelphia Police Officer Kenneth Kustra, who, together with his canine partner, Riky, a Philadelphia police dog, conducted a canine search of Defendant's vehicle. Finally, the Government presented the testimony of Philadelphia Police Officer James Zimmerman, who assisted in the training of the police dog Riky, and the canine handler, Officer Kustra. Defendant presented the testimony of expert witness Steven Nicely, who testified about the training of

police dogs and handlers generally, and offered an opinion about the canine narcotics search that occurred on Defendant's vehicle.

B.      **Findings of Fact**

At approximately 12:25 p.m. on June 23, 2016, Pennsylvania State Troopers Jeffrey Smith and Mark Salerno were patrolling in a marked police cruiser. (May 9 Hr'g Tr. 10-12.) They were in their State Police uniforms. (*Id*. at 11-12.) Instead of being assigned to patrol a particular zone or sector such as I-95, the Troopers had been given "shield responsibilities" on that day, which means they had no specific assignment. (*Id*. at 10.) Trooper Smith has been with the Pennsylvania State Police for approximately five years. (*Id*. at 5.) Prior to that, he served with the Philadelphia Police Department for approximately nine years. (*Id*. at 5-6.) As a state trooper, he received training that focused on interdiction during the course of traffic stops. (*Id*. at 8.) Trooper Salerno has been a state trooper for four years. (*Id*. at 212.) He received training on interdiction and detection of criminality while making a car stop. (*Id*. at 213.)

Troopers Smith and Salerno were driving northbound on I-95 in the area of mile marker 12, when they observed a grey Pontiac Grand Prix also traveling north, with three African-American occupants. (Police Report, Def.'s Mot. Ex. D.) The Troopers observed the Pontiac cross three lanes of traffic in one continuous action, heading towards the exit for Island Avenue. (May 9 Hr'g Tr. 12-13; Police Report.) The Pontiac was being driven by Defendant Harold Cox. (May 9 Hr'g Tr. 13; Police Report.) The right turn signal of the Pontiac was activated when it crossed the lanes, and the movement did not cause any nearby drivers to beep their horns, or to apply their brakes. (May 9 Hr'g Tr. 13, 218.) As Defendant's vehicle exited the Island Avenue Exit, State Troopers Smith and Salerno began to follow behind the vehicle. (*Id*.) The State Troopers noticed that the right turn signal on the Pontiac remained on while driving on the exit

3

ramp, and did not turn off until Defendant moved to the left lane of Island Avenue. (*Id.*) At this time, Defendant used the left turn signal. (*Id.*) The State Troopers also noticed that the driver's side brake light was "much dimmer" than the brake light on the passenger side. (*Id.*; Police Report.)

The State Troopers initiated a traffic stop by turning on their sirens and flashing lights as the Pontiac approached the intersection of Island Avenue and Bartram Avenue. (May 9 Hr'g Tr. 13.) Defendant immediately pulled his Pontiac over in response to the sirens and flashing lights. (*Id.* at 217.) Trooper Smith used the microphone on the police car to direct Defendant to turn right onto Bartram Avenue, as it was a safer location for a traffic stop. (*Id.* at 13-14.) Defendant complied with the Troopers' command. (*Id.* at 14.) Trooper Smith testified that he believed Defendant's act of crossing three lanes of traffic violated two separate provisions of Pennsylvania's Motor Vehicle Code: Section 3334, which requires that vehicles switch lanes with "reasonable safety"; and Section 3714, which prohibits "careless driving." (*Id.*); *see* 75 Pa. Cons. Stat. Ann. §§ 3334(a), 3714(a). Trooper Smith also determined that Defendant's act of leaving the turn signal activated after exiting the off-ramp violated Section 3334 of Pennsylvania's Motor Vehicle Code, which states that "[t]urn signals shall be discontinued immediately after completing the turn or movement from one traffic lane to another traffic lane." (May 9 Hr'g Tr. 14-15); *see* 75 Pa. Cons. Stat. Ann. § 3334(d).

Trooper Smith exited the police cruiser and approached Defendant's vehicle on the passenger side. (May 9 Hr'g Tr. 15; Video at 1:53, Def.'s Mot. Ex. A.)[2] Approximately twenty seconds later, Trooper Salerno approached the Pontiac on the driver's side and looked through

---

[2] The parties stipulated that the video submitted by Defendant with his Motion to Suppress is the same video that was played during the Suppression Hearing on May 9, 2017. The video begins at 00:00 time stamp, and continues until approximately 2 hours and 3 minutes. We refer to the approximate time on the video in citations. The video has no sound.

the back window. (Video at 2:15.) Defendant Cox was in the driver's seat. (May 9 Hr'g Tr. 15.) Thomas Finks was in the front passenger's seat, and Ricky Jones, Jr. was in the back seat. (Police Report.) Trooper Smith remained at the front passenger side window of the Pontiac for less than one minute. (May 9 Hr'g Tr. 219.) During this time, Trooper Smith and Defendant spoke briefly, and Defendant handed Trooper Smith his license, registration and insurance card. (*Id*.) Trooper Smith testified that as he looked across the front seat of the Pontiac from the passenger's side, Defendant, who was in the driver's seat, appeared to be nervous. (May 9 Hr'g. Tr. 15.) Specifically, Trooper Smith testified that Defendant's hands were shaking, and that his "breathing was very shallow, as if he had been running." (*Id*. at 15-16.) In addition, Trooper Smith testified: "I also noticed on his left side his shirt was moving rapidly in the area of his heart, which indicated to me that his heart was racing." (*Id*. at 16.) Trooper Smith stated that Defendant appeared as though he was going to vomit. (*Id*.) Trooper Smith asked Defendant to step outside of his vehicle. (*Id*.)

Trooper Smith believed that Defendant may have grabbed a weapon because he was taking too long to exit the vehicle. (*Id*.) Trooper Smith walked to the driver's side of the vehicle to make sure that Defendant did not have any weapons in his hands, and confirmed that he did not. (*Id*.) Trooper Smith thought that Defendant seemed agitated when he got out of the vehicle. Defendant told Trooper Smith that he was a working man and asked why he was being stopped. (*Id*.) Trooper Smith and Defendant had a discussion near the trunk of the Pontiac about the traffic violations the Troopers observed. (*Id*. at 17-18.) Trooper Smith stated that Defendant appeared nervous and uncomfortable. (*Id*. at 18 (noting that Defendant was moving around and fidgeting).) A review of the video shows that Defendant can be observed using his hands to explain things to Trooper Smith during the conversation. (Video at 3:00-5:30.) Defendant does

5

not appear in the video to be at all nervous. (*Id.*) Moreover, during the discussion with Defendant, Trooper Smith put his hand on Defendant's shoulder several times as if he was talking to a friend. (Video.)

According to Trooper Smith, Defendant explained that he was coming from Chester, that he didn't know passenger Jones but was taking Jones home, and that he was taking passenger Finks to work. (May 9 Hr'g Tr. 18.) Trooper Smith also testified that Defendant only knew Finks' nickname, "Fats", and not his full name. (*Id.*) Trooper Smith thought it was suspicious that Defendant knew Finks his entire life, but did not know his full name. (*Id.*) Trooper Smith conducted a protective pat down frisk of Defendant to make sure he didn't have any weapons. (*Id.* at 18-19; Video at 3:00.)[3] The search yielded no weapons or contraband. (May 9 Hr'g Tr. 19.) Trooper Smith then asked Defendant to sit on the bumper of the police cruiser so that he could question Finks and Jones. (*Id.*)

Trooper Smith next spoke to Jones, who had indicated that he had been coming from Chester and did not know anybody else in the car. (*Id.*) Trooper Smith patted down Jones and found no weapons or contraband on him. (*Id.*) Trooper Smith next spoke to Finks, who had indicated that he did know Defendant, knew his name, and had known him his entire life. (*Id.*) Finks also indicated that he did not have to work, and that Defendant was going to take him home. (*Id.*) When Finks stated that he intended to watch the NBA Draft later that day, Trooper Smith asked whether Defendant was going to also watch the NBA draft. (*Id.* at 20.) Trooper Smith, in an attempt to create an inconsistency, asked Finks this question because Defendant had

---

[3] After Defendant emerged from the Pontiac, approximately two-and-a-half minutes went by before Trooper Smith conducted a protective pat down of Defendant. (Video at 3:00-5:35.) On cross-examination, Defense counsel questioned Trooper Smith about why it took so long to conduct a protective frisk on Defendant when Trooper Smith had indicated on direct examination that he was suspicious Defendant may have had a weapon when he emerged from the Pontiac.

earlier indicated that he was going to go to work after dropping off Finks and Jones. (*Id*.) Finks responded that he didn't know what Defendant was doing later, but maybe they would watch the NBA draft together. (*Id*.) Trooper Smith deduced from this response that Defendant had lied about going to work later. (*Id*.) Trooper Smith patted down Finks and found no weapons or contraband. (*Id*. at 81.)

Trooper Smith then went to his police vehicle to review the records that Trooper Salerno had retrieved from the three passengers. (*Id*. at 22.) He learned that Defendant had a valid driver's license, valid insurance, was the rightful owner of the vehicle, and was not on probation or parole. (*Id*. at 79.) Despite this information, Trooper Smith believed that the three individuals were engaged in criminal activity. (*Id*.) Trooper Smith explained to Defendant all of the reasons he believed the three men were engaged in criminal activity. (*Id*. at 22-23.) Specifically, he explained that Defendant was acting nervous and that the men provided inconsistent explanations about where they were headed. (*Id*.) Trooper Smith asked Defendant for his consent to search the vehicle. (*Id*. at 23.) Defendant did not provide his consent. (*Id*.) Trooper Smith then asked Trooper Salerno to call the Pennsylvania State Police canine unit and request a narcotics-sniffing dog. (*Id*.) The Pennsylvania State Police dog assigned to their troop was unavailable that day. (*Id*.) The Troopers requested a secondary dog through dispatch. (*Id*. at 24.) Dispatch informed the Troopers that the police dog assigned to the Allentown area would be assisting them. (*Id*.) Because Trooper Smith believed that police dog from Allentown would take over an hour to arrive to the scene, he contacted the Philadelphia Police Department to request a canine unit.

(*Id*.) The Philadelphia Police Department stated that a canine unit could be at the scene in fifteen to twenty minutes. (*Id*.)[4]

The Philadelphia Police canine unit arrived to the scene of the traffic stop almost an hour after the traffic stop was first initiated. (Video at 54:37.) When the Philadelphia Police canine unit arrived, the canine handler, Officer Kustra, spoke with Trooper Smith briefly about the vehicle stop. (May 9 Hr'g Tr. 26.) Officer Kustra's police dog, Riky, then performed a sniff test on the exterior of the Pontiac. (*Id*.) Officer Kustra commanded Riky to search for narcotics, and the two walked around the perimeter of the Pontiac twice—once clockwise, and once counter-clockwise. (*Id*. at 112-113.) After the second time circling the Pontiac, Riky appears to begin to sit down at the rear of the vehicle. (*Id*. at 114.) Officer Kustra testified that Riky sitting at that location meant a positive indication for narcotics in the trunk of the vehicle. (*Id*. at 27, 114.)

Trooper Smith explained to Defendant that the police dog had made a positive indication at the trunk of the car, and that he was going to conduct a search of the vehicle. (*Id*. at 27.) Trooper Smith located the owner's manual in the glove compartment, and figured out how to open the trunk of the Pontiac. (*Id*. at 28.) There were no narcotics found in the trunk of the Pontiac. Inside the trunk, Trooper Smith did find a duffle bag, and inside the duffle bag there was a rifle. (*Id*.) The Troopers ordered all three occupants to get on the ground, and they complied. All three were handcuffed. (*Id*. at 29.) A continued search of the trunk and duffel bag produced a magazine containing live rounds of ammunition, a black mask, black gloves, two black hats, a rubber theatrical mask, and an air pistol. (Police Report; May 9 Hr'g Tr. 29-30.) In a smaller medicine or travel bag located in the trunk, Trooper Smith found medicine prescribed

---

[4] Trooper Smith was ultimately reprimanded for requesting the canine unit from the Philadelphia Police Department. Pennsylvania State Police Procedures require that troopers utilize state police canine unites when available. (May 9 Hr'g Tr. 25.)

to Defendant. (May 9 Hr'g Tr. 29.)[5]  Trooper Smith questioned Defendant about the medicine, and the fact that it belonged to him, and was located in the trunk with the weapon. (*Id*.)

Trooper Smith then took Defendant to the back seat of the police cruiser and read him his *Miranda* rights. (May 9 Hr'g Tr. 30, 223.) Trooper Smith asked Defendant several questions about the items found in the trunk of the Pontiac. (*Id*.) At that time, Defendant stated that the gun did not belong to him. (*Id*. at 31.) Finks was placed the back of the police cruiser with Defendant. (*Id*. at 33.) Trooper Salerno was in the front seat. (*Id.* at 215.) After about two to three minutes, Defendant leaned forward and stated to Trooper Salerno that he wanted to take responsibility for the items found in the trunk. (*Id*. at 216.) Trooper Salerno shared Defendant's statements with Trooper Smith, who in turn had a discussion with Defendant about his confession. (*Id*. at 37.) Trooper Smith asked Defendant if he could search his iPhone for pictures of the gun. (*Id*.) Defendant provided Trooper Smith his password and Trooper Smith looked through pictures and text messages on Defendant's phone. (*Id*.) Trooper Smith observed that Defendant had sent a text message during the traffic stop. (*Id*.) The text message stated that Defendant had been stopped by the troopers and that that he was "going back to jail." (*Id*.) Defendant was transported to the Philadelphia Detention Unit for further processing. (Police Report.) No traffic citations were issued to Defendant. (May 9 Hr'g Tr. 44.) The Pennsylvania State Police has a policy under which Troopers may not issue traffic citations in the city and county of Philadelphia. (*Id*.)

## II. DISCUSSION

Defendant argues that the items located in the trunk, including the firearm, as well as all statements Defendant made to the State Troopers or on his cellular phone, should be suppressed

---

[5] Defendant had advised the Troopers that he suffered from diabetes.

as a violation of Defendant's Fourth and Fifth Amendment rights. For purposes of Defendant's constitutional arguments, the interaction between Defendant and the State Troopers can be divided into four discrete stages: (1) the initial traffic stop; (2) the prolonged detention of Defendant awaiting the canine unit to arrive; (3) the search of the Pontiac after a positive indication was made by the police dog; and (4) the statements made by Defendant to the Troopers, including any statements observed on his cell phone. We conclude that Defendant's constitutional rights were violated at the second stage. Accordingly, we need not address the third and fourth stages of this detention.

### A. The Initial Stop

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV; *see also United States v. Ubiles*, 224 F.3d 213, 216 (3d Cir. 2000). "It is settled law that a traffic stop is a seizure of everyone in the stopped vehicle." *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006). If a car is stopped illegally, the passengers "may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine." *Id.* A traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations. *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)); *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) ("A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation." (citation omitted)). "[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *Mosley*, 454 F.3d at 252. "[T]he *Terry* reasonable suspicion standard applies to routine traffic stops." *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006). The District Court should "under take an objective review of the officer's rational for the investigatory traffic stop"

to determine "whether specific, articulable facts produced by the officer would support reasonable suspicion of a traffic infraction." *Id*. at 397-98.

Troopers Smith and Salerno allege that Defendant committed the following three traffic violations: (1) cutting across three lanes of traffic, in violation of 75 Pa. Cons. Stat. Ann. § 3714; (2) permitting one of his rear brake lights to be dim, in violation of 75 Pa. Cons. Stat. Ann. § 4303(c); and (3) continuously displaying his right turn signal when merging onto a roadway on the left, in violation of 75 Pa. Cons. Stat. Ann. § 3334. Defendant contends that the State Troopers "contrived traffic violations to investigate their suspicion that 'something must be up' when three black men are driving in a car together at 12:25 in the afternoon." (Def.'s Mot. 12.)

With respect to Defendant cutting across three lanes of traffic, the Government relies on Section 3714 of the Code, which is entitled "Careless driving." That Section states that "any person who drives a vehicle in careless disregard for the safety of persons or property is guilty of careless driving, a summary offense." 75 Pa. Cons. Stat. Ann. § 3714(a). Defendant had his turn signal on prior to crossing two lanes of traffic towards the exit ramp. In addition, Defendant's movement caused no surrounding vehicles to beep their horns or to use their brakes. The Government has not met its burden of "providing the specific articulable facts to justify a reasonable suspicion to believe" that Defendant engaged in reckless driving in violation of Section 3714. *Delfin-Colina*, 464 F.3d at 397 (noting that the initial burden is on the police officers to prove reasonable suspicion) (citation and internal quotation marks omitted).

Similarly, the Government has not met its burden in proving that a dim brake light is a violation of Pennsylvania's motor vehicle code. The Government relies on Section 4303 of Pennsylvania's Motor Vehicle Code, which addresses the general lighting requirements for vehicles. The statute requires that "[e]very vehicle operated on a highway shall be equipped with

11

a rear lighting system, including, but not limited to, rear lamps, rear reflectors, stop lamps and license place light . . . ." 75 Pa. Cons. Stat. Ann. § 4303(b). That statute is silent about the brightness of those lamps. The Regulations associated with the Motor Vehicle Code states only that "stop lamps, turn signals and hazard warning lamps shall be visible at a distance of 100 feet during normal sunlight." 67 Pa. Code § 175.66(f)(1). There is no evidence in the record that the brake lights on the Pontiac failed to comply with the Regulations.

Finally, the Government argues that Defendant's actions while he drove on the exit ramp constitute traffic violations. Specifically, the Government contends that Defendant continuously displayed his right turn signal during the duration of the exit ramp, and upon merging onto the roadway on the left. The Government relies on Section 3334 of the Motor Vehicle Code, which provides that "[u]pon a roadway no person shall turn a vehicle or move from one traffic lane to another . . . unless and until the movement can be made with reasonable safety nor without giving an appropriate signal in the manner provided in this section." 75 Pa. Cons. Stat. Ann. § 3334(a). The statute also provides that "[t]urn signals shall be discontinued immediately after completing the turn or movement from one traffic lane to another traffic lane." *Id*. § 3334(d). Trooper Smith testified that when the Pontiac entered the exit ramp for Island Avenue, the right turn signal was left on the entire time it was on the ramp. (May 9 Hr'g Tr. 13.) Trooper Smith also testified that at the end of the ramp, while the turn signal was still on, the Pontiac merged left, at which point the turn signal came off. (*Id*.) Based on Trooper Smith's testimony, Defendant's actions may constitute violations of Pennsylvania's Motor Vehicle Code, namely Sections 1334(a) and (d). Under the circumstances, we must conclude that the Troopers had a reasonable suspicion to initiate a traffic stop of Defendant, and that the stop was lawful under the Fourth Amendment.

12

### B. Prolonged Detention of Defendant

Next, Defendant contends that once the traffic investigation concluded, the State Troopers no longer had any justification to detain him pending arrival of the canine unit. In other words, Defendant contends that the State Troopers lacked a reasonable suspicion to prolong the detention beyond what was necessary to investigate the alleged traffic violations. The canine unit arrived approximately fifty-five minutes after the traffic stop was initiated. The Troopers completed the investigation of the traffic violations within the first ten to fifteen minutes of the stop.

Police may lawfully extend a traffic stop for investigative purposes, however, only if they have a reasonable articulable suspicion that the occupants are engaged in criminal activity. *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (holding that absent reasonable suspicion, "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed"); *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) ("After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.").

The Government and Defendant do not dispute that Trooper Smith and Trooper Salerno had concluded their traffic stop investigation. Indeed, the Troopers processed all of the identifications, insurance information, and proof of registration, and determined that there were no outstanding warrants on the passengers of the Pontiac. The Government argues instead that the Troopers were lawfully permitted to extend the duration of the detention beyond what was required to investigate the traffic violations based on a reasonable suspicion that Defendant was engaged in criminal activity. The Government contends that Defendant's nervousness combined

with the inconsistent explanations provided by the passengers in the vehicle gave the State Troopers ample reasonable suspicion to justify prolonging the detention another forty-five minutes to allow a canine unit to arrive at the scene.

Reasonable suspicion is an objective standard determined by the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417 (1981). It requires a police officer to point to "specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). It must be based on "something more substantial than an 'inchoate and unparticularized suspicion or hunch.'" *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (quoting *Terry*, 392 U.S. at 27). While certain behavior may be entirely legal, it can, nonetheless, lead to an inference of criminal activity. *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000).

The nervousness of an individual is a factor that may be taken into account when determining if the facts support a reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). However, there needs to be more than just mere nervous or evasive behavior to justify further detention. *See United States v. West*, 103 F. App'x 460, 462 (3d Cir. 2004) ("While such [nervous] behavior clearly is relevant in the assessment of whether there was reasonable suspicion, it is not necessarily enough, standing alone."); *Johnson v. Campbell*, 332 F.3d 199, 209 (3d Cir. 2003); *cf. United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) ("[T]he Supreme Court has never held that unprovoked flight alone is enough to justify a stop."); *United States v. Reyes Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003) ("We have recognized that mere 'uneasy feelings' and inconsistent stories between a driver and a passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking." (citing

14

*United States v. Santiago*, 310 F.3d 336, 338-39 (5th Cir. 2002)). It is not unusual for drivers, even innocent ones, to be nervous when stopped by police officers.

Here, the totality of the circumstances indicate that Trooper Smith and Trooper Salerno lacked the objective, reasonable suspicion necessary to detain Defendant, Finks, and Jones for almost an hour until the canine unit arrived to conduct a sweep of Defendant's Pontiac. The facts do not show that Defendant acted evasively. He complied with each of the State Troopers' commands. His refusal to consent to the search of the Pontiac is not evidence of evasiveness. *United States v. Leal*, 235 F. App'x 937, 939 (3d Cir. 2007) ("It is well established that a refusal to consent to a search cannot be the basis for a finding of reasonable suspicion."). With regard to Defendant's demeanor, although we do not doubt that he may have exhibited some signs of nervousness, we are not persuaded that the nervousness was "extreme" or contributed to a finding of reasonable suspicion. The record simply does not support a finding that Defendant acted any more anxious than one would act if pulled over and ordered to exit their vehicle by two State Troopers. In addition, Trooper Smith's testimony lacked credibility regarding his observations of Defendant. For example, Defendant's actions as seen on the video do not support the level of nervousness described by Trooper Smith. In addition, Trooper Smith's testimony that Defendant's heart was pounding so hard that you could see it through his t-shirt strains credulity. Trooper Smith had visually observed Defendant for less than a minute from the passenger side of the car, looking across the passenger, Fink. Trooper Smith's credibility is also undermined by the apparent inconsistency between his concern that Defendant may have been armed, and his cordial demeanor towards Defendant after Defendant exited the vehicle, and the delay in conducting a frisk on him for weapons.

In addition, it does not appear as though any of the three passengers said anything that was inconsistent with what was said by another passenger. Defendant, Finks, and Jones all stated that they were coming from Chester. They all stated they were headed home or to work. At worst, Defendant noted that he did not know Finks. However, he quickly reiterated that he only knew him by his nickname, Fats. Defendant may not have known whether Finks would be dropped off at work or at home. Similarly, Finks may have not known whether Defendant had to work, or whether he could join Finks in watching the NBA draft later that evening. However, these statements are not contradictory. Nor do they create a reasonable suspicion that the individuals were engaged in criminal activity. There is simply nothing in this record that casts serious doubt on Defendant's statements as to where he was coming from and where he was headed.

In *Johnson*, 332 F.3d at 209, the police argued they had a reasonable suspicion of criminal activity because the defendant was acting nervous and agitated, lacked an apparent basis for being where he was stopped, was pacing, rubbing his head, and offered "clipped answers" to questions. The Third Circuit rejected this argument, contending that these observations "simply did not give rise to a reasonable, articulable suspicion that he was engaged in criminal activity." *Id*. The Court observed that, unlike other precedential cases where reasonable suspicion was found, the officers in *Johnson* were unable "to articulate a chain of inferences that led logically to their belief that criminal activity was afoot." *Id.* at 210. The same observation holds true here. The State Troopers have not pointed to any facts that lead logically to the reasonable belief that Defendant or the other passengers in the Pontiac were engaged in criminal activity. Simply because Defendant may have seemed nervous and the passengers' statements about where they were headed were not identical does not rise to the level of reasonable suspicion. The

16

Government has presented nothing more than the State Troopers' "inchoate and unparticularized suspicion or hunch," that criminal activity was afoot. *Terry*, 392 U.S. at 27. This is insufficient.

Accordingly, we are satisfied that Defendant's Fourth Amendment rights were violated by the State Troopers' extended detention long after the investigation of the traffic stop had concluded. As a result, all physical evidence obtained as a result of the search of the Pontiac, and all statements obtained from Defendant or observed on his cellular phone will be suppressed. We need not reach Defendant's final arguments regarding the reasonableness of the canine search, and the alleged Fifth Amendment violations by the State Troopers.

### III. CONCLUSION

For these reasons, Defendant's Motion to Suppress will be granted.

An appropriate Order follows.

**BY THE COURT:**

_____
**R. BARCLAY SURRICK, J.**